Date signed January 28, 2009



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

In re:
BENSON J. FISCHER,

                                        Case No. 03-13704-TJC
                                         (Chapter 7)

             Debtor.

---

ROGER SCHLOSSBERG,
Chapter 7 Trustee,

             Plaintiff,                              Adv. Pro. No. 05-01011

v.

BENSON J. FISCHER, et al.,

             Defendants.

---

## MEMORANDUM OF DECISION

Before the Court are a number of matters filed in the above-captioned bankruptcy case and adversary proceeding:  the Amended Complaint filed by Roger Schlossberg, the Chapter 7 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate of Benson J. Fischer ("Benson Fischer" or "Fischer") (Docket No. 141 in Adv. Pro. 05-01011); a Joint

Objection to the Debtor's Claim of Exemptions (the "Joint Objection") (collectively,

Docket Nos. 129 and 130 in Case No. 03-13704); two proofs of claim (Claim Nos. 15

and 16) filed by the Trustee on behalf of Sheldon Fischer (Claim No. 15), and on behalf

of Lauren Brisky and Gary Posner, Fischer's sister-in-law and her husband (Claim No.

16), along with the objections filed  thereto (Docket Nos. 383 and 385 in Case No. 03-

13704); a motion to exclude Defendant's Exhibits (hereafter "DX") 57-59; and the

Debtor's Renewed Motion to Dismiss Chapter 7 Case (the "Motion to Dismiss") (Docket

No. 139).

## INTRODUCTION

On March 28, 2003, Benson Fischer filed his Chapter 7 bankruptcy petition.  He

filed the required schedules (Schedules A-J) on April 28, 2003.  On Schedule C –

Property Claimed as Exempt, Fischer claimed exemptions for, *inter alia*, his "Fifty

percent (50%) tenants by the entirety interest in Montgomery Bakers, Inc." which he

valued at $2 million. He also claimed as exempt a "Promissory Note executed by

Montgomery Bakers, Inc. for the benefit of Benson and Mona Fischer" also as tenants by

the entirety.  The original complaint initiating this adversary proceeding was filed on

January 7, 2005 and, on September 14, 2005, pursuant to an order granting the Trustee's

motion, an amended complaint was filed.

In the Amended Complaint, [1] the Trustee seeks relief on four counts. [2]  Count I,

against Montgomery Bakers Inc. ("MBI"), seeks a judgment in the amount of $750,000

---

[1] The Trustee filed the initial complaint in this adversary proceeding on January 7, 2005.  On July 1, 2005, the Trustee filed a Motion for Leave to File Amended Complaint (Docket No. 107).  Benson and Mona Fischer filed an opposition to that motion (Docket No. 110).  The Court held a hearing on August 29, 2005 and granted the motion by order dated September 14, 2005 (Docket No. 140).
[2] As filed, the Amended Complaint stated eight counts.   However, prior to trial, Plaintiff expressly abandoned Counts V and VI.  *See* Trustee's Pretrial Statement (Docket No. 196 in Adv. Pro. No. 05-1011

for alleged "unpaid compensation due and owing from [MBI] for services rendered by the Debtor during the period from January 1, 2001 through March 28, 2003."  Amended Complaint, p. 8, ¶ 40.  Count II, against MBI, Fischer and Mona Fischer, his wife ("Mona Fischer" or, in context, "his wife") seeks a declaratory judgment against Defendants that Fischer's ownership interest in MBI's stock is property of the bankruptcy estate and is not held in a tenancy by the entirety, or, even if held in a tenancy by the entirety, can still be administered by the Trustee because "there exist holders of undisputed joint debts among the Debtor's creditors."  Amended Complaint, p. 9, ¶ 46.  Count VII, against Fischer and his wife, requests that this Court set aside alleged transfers made by Fischer to himself and his wife as tenants by the entireties, which the Trustee alleges operated as a fraud on creditors, pursuant to Maryland Code, Family Law – Title 4: Spouses, § 4-301.  Count VIII, against Fischer and his wife, also requests the setting aside of the same alleged transfers made by Fischer to himself and his wife as tenants by the entireties, which the Trustee alleges operated as a fraud on creditors, pursuant to Maryland Code, Commercial Law – Title 15, Subtitle 2: Fraudulent Conveyances, §§ 15-201 – 15-214.  In response to the Amended Complaint, MBI, Mona Fischer and Fischer (collectively, "Defendants") filed Answers (Docket Nos. 143 and 144 in Adv. Pro. No. 05-01011).

Merrill Cohen, the initial trustee of Fischer's bankruptcy estate, and two of Fischer's creditors – Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered ("Paley Rothman") and Alan Mark, Esquire, an attorney at Paley Rothman ("Mark") – filed the Joint Objection (Docket No. 129 in Case No. 03-13704).  Jill Flax, personal representative of the estate of Harold Flax ("Flax"), another creditor, joined in and

at p. 6).  Further, the Trustee also stated that the need for trial on counts III and IV was obviated by prior orders entered in the adversary proceeding.  *Id.* at p. 5.

adopted the Joint Objection (Docket No. 130 in Case No. 03-13704).  Fischer filed an

Opposition to the Joint Objection (Docket No. 137 in Case No. 03-13704).  The Trustee,

standing in the shoes of the initial trustee, has continued to prosecute the Joint Objection.

The relief sought in the Joint Objection is substantially the same as the relief sought by

the Trustee in Count II of the Amended Complaint.[3]

On September 1, 2004, Fischer filed the Motion to Dismiss.  In it, he argues that

dismissal of his bankruptcy case will not prejudice any creditors because all of his assets

are held by him and his wife as tenants by the entirety and thus are not available for

distribution to his individual unsecured creditors.  Leslie Atkins (another creditor), Paley

Rothman, Flax, and the initial Chapter 7 Trustee filed objections to the Motion to Dismiss

(Docket Nos. 145, 151, 152, and 155 in Case No. 03-13704).

On January 7, 2007, the Trustee filed a proof of claim (Claim No. 16) on behalf of

Gary Posner and Lauren Brisky (collectively, the "Posners").  The claim alleges that

Fischer and his wife are jointly obligated to the Posners on a note in the amount of

$250,000.  On January 13, 2007, Fischer filed an Objection to Allowance of Claims

(Docket No. 367 in Case No. 03-13704) and on August 2, 2008 the Posners filed their

Reply to Proof of Claim Filed by Trustee (Docket No. 385 in Case No. 03-13704), in

---

[3] As filed, the Joint Objection sought the disallowance of the Debtor's exemption of 100 percent of the issued and outstanding stock of 1342 Restaurant Group, Inc. In addition, similar to Count II of the Amended Complaint, the Joint Objection sought disallowance of the Debtor's exemption of property held as tenants by the entirety to the extent the Debtor and his wife had joint creditors.  By letter dated January 19, 2007 (Docket No. 207 in Adv. Pro. 05-01011), the Trustee abandoned his objection to the exemption of the 1342 Restaurant Group, Inc. stock.  In addition, the Trustee deferred his objection to the Debtor's exemption of property held as tenants by the entirety to the extent that joint creditors exist, pending the determination that any joint claims would be allowed. Because of the overlap between Count II and the Joint Objection, they were consolidated for purposes of trial. *See* Consent Order Severing and Consolidating Count II of Complaint for Purposes of Trial Only (Docket No. 85 in Adv. Pro. 05-01011).

which they stated that they did not ask the Trustee to file a claim in their names and that they do not want the Trustee to administer this claim on their behalf.

The Court conducted trial proceedings on numerous days throughout 2007: the parties presented their cases on January 23-24, February 5 and 23, April 13 and June 20; the Court heard closing arguments on September 10. Both the Trustee and Defendants filed post-trial briefs and reply briefs.

Having now considered the proofs presented at trial, the closing arguments, the post-trial memoranda, and other relevant papers, the Court, for the reasons set forth below, will (1) deny the relief sought in the Amended Complaint and enter judgment in favor of Defendants; (2) disallow Claim No. 16; (3) overrule the Joint Objection; and (4) deny the Motion to Dismiss.

## I.      JURISDICTION

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A),(B),(H) and (O).

## II.      FINDINGS OF FACT

### A. The Creation of Individual Claims Against Benson Fischer: The Paley Rothman/Flax Litigation

In 1997, Fischer, acting through The Fischer Brewing Co., Inc., initiated a civil action against Flax, Mark, and Paley Rothman in the Superior Court for the District of Columbia (the "Superior Court"). Fischer's claims in that litigation were based on a letter agreement between him and Flax which provided for Fischer to pay Flax fifteen percent (15%) of future company stock as compensation for introducing Fischer to an underwriter who could raise financing for Fischer Brewing. At that time, Mark and Paley

Rothman represented Flax.  Flax, Mark and Paley Rothman filed counterclaims against Fischer, which included a claim for bad faith litigation.

On February 25, 2000, the Superior Court held a bench trial on the bad faith litigation counterclaims.  The Court determined that Fischer was properly notified of the trial date but chose not to appear by counsel or otherwise.  The plaintiffs' case was therefore dismissed.

On May 3, 2000, the Superior Court, per Judge Steffen Graae, entered judgment in favor of Flax, Mark and Paley Rothman on the bad faith litigation claims "and [ultimately] awarded them collectively some $930,000 in attorney's fees and costs, together with $40,000 in punitive damages."  *Fischer et al. v. Estate of Flax et al.*, 816 A.2d 1, 3 (D.C. Ct. of App. 2003); *see also Goldschmidt et al. v. Paley Rothman et al.*, 935 A.2d 362, 367 (D.C. Ct. of App. 2007) (same).  In reviewing Judge Graae's award of attorney's fees and costs, the D.C. Court of Appeals found no reason to overturn his findings that "throughout the litigation Fischer had orchestrated a continuing cover-up of his involvement in the preparation of letters fraudulently documenting" his alleged causes of action.  816 A.2d at 13 (internal quotations and emendations omitted).  Indeed, the appellate court held that these findings were "tantamount to a determination that Fischer had perpetrated a fraud upon the court" and that "[b]y themselves they lend strong support to the judge's conclusion that Fischer's entire suit was filed and maintained in bad faith."  *Id.*  Further, acknowledging that Judge Graae's award of fees and costs also relied on another basis, the Court of Appeals went on to note, with regard to another of the claims Fischer made in his complaint, not only that it was false, but that "Fischer always knew it to be false."  *Id.*  "All told," the appellate court held, Judge Graae did not

6

abuse his discretion by concluding that "Fischer's conduct in pursuing claims of wrongdoing by Flax and Paley Rothman . . . was so egregious that fee shifting is warranted as a matter of equity." *Id.* at 14 (internal quotations and citation omitted).

The judgments were entered against Fischer individually, and not against Mona Fischer.

**B.  Fischer's Involvement in MBI**

*1.  The initial equity investment in and loans to MBI.*

MBI was formed in July 2001, to acquire substantially all of the assets of Montgomery Donuts, Inc. ("MDI"), a bakery in a Chapter 11 proceeding in this Court. *See* Case No. 99-22865.

On May 15, 2001 prior to MBI's incorporation, Fischer, his wife, and his parents (Sheldon Fischer and Ann Fischer) executed a document titled "Agreement Between Sheldon Fischer and Benson Fischer as to Ownership of Montgomery Bakers, Inc." (hereafter, the "Stockholder Agreement") (Plaintiff's Exhibit 37) (Plaintiff's Exhibits are hereafter "PX"; Defendants' Exhibits are hereafter "DX").  Paragraph 1 of the Stockholder Agreement provides:

> The shares of stock of Montgomery Bakers, Inc. (the "Corporation") shall be owned as follows: One Thousand (1,000) shares of stock (or fifty percent (50%) of the Corporation) will be owned by Benson Fischer and Mona Fischer, as tenants by the entirety,[4] and Five Hundred (500) shares of stock will be owned by Sheldon Fischer and Five Hundred (500) shares of stock will be owned by Ann Fischer.

PX 37, ¶ 1 (footnote added).  In addition, Paragraph 6 of the Stockholder Agreement, in relevant part, provides as follows:

---

[4] Extremely relevant to an argument advanced by the Trustee, this is one of two references in the Stockholder Agreement to Benson and Mona Fischer's interest in MBI being held in a tenancy by the entirety.  *See* PX 37, ¶¶ 1 and 3.

7

In the event of (i) the death of Benson Fischer; or (ii) the death of Sheldon Fischer, the remaining shareholder shall have the right to purchase the shares of the deceased shareholder at a purchase price to be agreed upon between the remaining shareholder and the representative of the deceased shareholder . . . . [Mona Fischer agrees that in the event of the death of Benson Fischer, she shall join in the sale of the shares to Sheldon Fischer, and in the event of the death of Sheldon Fischer, and the devolvement of Sheldon Fisher's shares to her by testamentary devise or operation of law, Ann Fischer agrees to join in the sale of her shares along with those of Sheldon Fischer to Benson Fischer and Mona Fischer, as tenants by the entirety].

*Id.*, ¶ 6.

MBI was incorporated on June 22, 2001. Sheldon and Ann Fischer each owned 500 shares individually. Benson and Mona Fischer jointly owned 1000 shares. The initial total stockholder investment was $1000. *See, e.g.*, DX 19 at p. 4 (reflecting initial stockholders equity of par value and additional paid-in capital of $1000). Therefore, Sheldon Fischer invested $250, Ann Fischer invested $250, and Benson and Mona Fischer invested $500.

Because of the *de minimis* stockholder investment, the funds initially needed by MBI were provided from two loans. The first loan was from Sheldon and Ann Fischer in the amount of $599,112 at an interest rate of ten percent (10%) per annum. The second loan (the "Debtor Loan") was from Fischer and his wife in the amount of $310,000, also at an interest rate of ten percent (10%) per annum.

The sources for the Debtor Loan consisted of the $250,000 which Fischer and his wife borrowed from the Posners (and which was disbursed directly to MBI's account) and $60,000 from an individual account of Mona Fischer. It was evidenced by a promissory note that was payable "to the order of Benson Fischer and Mona Fischer, as

8

tenants by the entirety…." DX 6, ¶1. MBI used the proceeds of the two loans to finance the purchase of the MDI assets.

In September of 2001, MBI began repaying the Debtor Loan. Generally, MBI made monthly payments of $8,957. These monthly payments were deposited into a joint checking account Fischer held with his wife.

By December 31, 2001, MBI had repaid $25,816 of the outstanding principal on the Debtor Loan. In addition, MBI paid Fischer and his wife at least $7,429.53 in interest on the Debtor Loan in 2001.

In 2002, MBI repaid $84,795 of principal on the Debtor Loan, reducing its balance to $199,389. Included in these payments was a $1000 payment to Barry Haberman[5] and $1000 to CitiBank, which were debited to the Debtor Loan.[6] Moreover, MBI paid Fischer and his wife $24,691.88 in interest on the Debtor Loan in 2002. In 2003, MBI repaid $95,385 in principal on the Debtor Loan, further reducing the balance to $104,004. Included in the 2003 payments was $12,877.51 to Fischer and his wife for interest on the Debtor Loan.

The books and records of MBI treated the Debtor Loan as a loan from Benson and Mona Fischer to MBI. Specifically, the Debtor Loan was listed on the balance sheet under the long term liabilities as a "Note Payable B & M Fischer" in each of years 2001, 2002 and 2003. The amount of the Debtor Loan was reduced each year to reflect the loan repayments during the year. The MBI income statement included the interest expense paid on the Debtor Loan. The interest and principal repayments on the Debtor Loan were deposited into a joint bank account of Benson and Mona Fischer.

---

[5] Barry Haberman is an attorney who represented the Debtor in numerous matters in the past.
[6] *See* DX 24.

The Debtor Loan was a bona fide loan made by Benson and Mona Fischer to MBI and held by them as tenants by the entirety, and the monthly payments by MBI to Benson and Mona Fischer were principal and interest payments on the Debtor Loan.

2.  *The lack of compensation for Sheldon and Benson Fischer.*

Fischer served as President of MBI, Sheldon Fischer served as Vice President. Fischer, his wife, and his parents were all members of the board of directors.

From its fledgling days, Fischer played the central role in establishing MBI as a successful company. He actively managed most aspects of MBI's business affairs (other than the financial affairs), including marketing, manufacturing, sales, and the day-to-day operations of the company. The parties entered into a stipulation listing the many, extensive activities in which Fisher was engaged on behalf of MBI. He sometimes worked seven days a week for MBI without receiving any compensation.

Neither Benson nor Sheldon Fisher received any salary or compensation from MBI. Sheldon testified that he structured many businesses the way he and Benson set up MBI – with initial shareholder loans that would be repaid before officer salaries were taken. The repayment of the shareholder loans provided the investors with cash flow, and no salary or compensation was paid that would serve to drain revenues on the income statement. The Court credits Sheldon's testimony as the reason Sheldon did not receive any compensation from MBI during the 20 months that MBI operated.

Benson's motivation for not taking a salary is another matter. In the months immediately preceding the incorporation of MBI, Benson had been the subject of intensive creditor actions by Paley Rothman, which had served writs of garnishment on numerous banks in Montgomery County seeking to garnish bank accounts and on four

10

companies with which Fischer had been associated seeking to garnish any wages.
Fischer was being advised by at least two bankruptcy and creditors' rights lawyers. They
reinforced his understanding that the MBI stock, as well as any other assets he acquired,
should be held as tenants by the entirety. Fischer knew full well that assets he owned
individually were subject to attachment, but assets he owned as tenants by the entirety
with Mona were not. Benson's awareness of the protection afforded by owning assets by
the entirety was so heightened that he signed and filed an *in forma pauperis* affidavit in
the District of Columbia litigation in which he claimed pauper status so that he did not
have to pay court costs, at a time when he and Mona had a net worth of almost two
million dollars, including hundreds of thousands of dollars of marketable securities. His
rationale: Since everything he owned was held by the entirety with Mona, he personally
could claim to be a pauper and avoid paying court costs.[7] Aside from providing a
measure of his character, the affidavit evidences Fisher's intense focus on the protections
afforded by tenancies by the entirety, and the lack of protection for assets that were not so
held.

    Fischer knew that his salary would be subject to garnishment. He knew that not
taking a salary would enhance the value of his equity interest in MBI, owned by the
entirety with Mona. Indeed, Fischer admits that his expected "remuneration" for his
services was the anticipated increase in the value of MBI stock.[8] Thus Fischer's
motivation for not taking a salary from MBI was that he was able to convert what would

---

[7] Fischer claimed that he signed and filed the affidavit on advice of counsel. Assuming that would provide an excuse for his actions, the Court notes that Fischer called the attorney and never asked any questions about the affidavit.

[8] "It is a fact of corporate existence that officers that hold corporate stock look to capital gains and the commensurate the [SIC] increased value of their shares as their means of remuneration, rather than salaries, which are taxable as ordinary income and which reduce net value. In a close corporation, in which officers, shareholders and key employees tend to be the same individuals, this is eminently just." Defendants Reply Memorandum of Law, Docket No. 245 in Adv. Pro. 05-01011 at  pp. 21-22.

have been salary (and therefore subject to garnishment) into increased equity in MBI (which was held by the entirety and therefore not subject to claims of Fischer's individual creditors). The Court finds that Fisher did not take any salary from MBI in bad faith and, further, did so with the actual intent to hinder and delay the collection efforts of Paley Rothman, Mark and Flax.

      *3.  The roof collapse and termination of MBI's operations.*

MBI initially used the purchased assets to engage in a business similar to MDI's former business. MBI sold doughnuts and other baked goods on a wholesale basis throughout the Washington, DC metropolitan area and also operated four retail outlets in Montgomery County, Maryland.

At the time MBI purchased MDI's assets and began operations, the business was losing approximately $50,000 per month. After the September 11, 2001 terrorist attacks on Washington, DC – which occurred within months after the acquisition – the volume of sales of MBI's products went down forty percent (40%) due to decreased travel and decreased purchases by restaurants, hotels and other regular customers, all of whose businesses were affected by the general business malaise that ensued in the wake of the 9/11 attacks. In the face of this unfortunate business slowdown, Fischer employed his expertise in the restaurant and food business, working to turn MBI into a profitable company.

Structural deficiencies in the roof of the warehouse which served as MBI's manufacturing site caused it to collapse after a snowstorm in mid-February 2003 and, on February 17, 2003, MBI ceased business operations completely. As a result of that roof collapse, MBI made claims upon its insurer, Erie Insurance Exchange ("Erie"), for

12

damages to property and interruption to business. Erie filed an interpleader action in the

Montgomery County Circuit Court (the "Circuit Court") and deposited the aggregate sum

of $1.6 million in that court's registry. On MBI's motion, the Circuit Court ordered that

the insurance proceeds be released to MBI. On a subsequent motion filed by Paley

Rothman, the Circuit Court ordered that a portion of the insurance proceeds be held in an

escrow account for the benefit of Paley Rothman, pending the conclusion of collection

proceedings instituted by Paley Rothman in the Superior Court, pursuant to a writ of

attachment.

### III.   CONCLUSIONS OF LAW

#### A. Count I (Unpaid Wages; Unjust Enrichment)

In Count I, the Trustee's theory is that Fischer performed unpaid services for MBI

and that he should have been paid a salary reflecting the reasonable value of those

services. Such salary, then, would have constituted assets subject to legal process. The

Trustee asserts a claim to recover the unpaid wages and also asserts an unjust enrichment

claim.

The Trustee's argument with regard to unpaid wages is dependent on his assertion

that Fischer was required to draw a salary (or, put another way, that MBI was required to

pay Fischer a salary) for the services he performed in establishing and then operating

MBI until it ceased business operations in February 2003. The Trustee does not cite any

legal authority that supports this assertion and the Court has not discovered any such

authority on its own.

The Trustee also argues that Fischer "deferred compensation, leaving the value of

his services in the corporate fisc until such time as he felt it safe to take it out in the form

of salary, bonus or distributions," and that "such deferred compensation is . . . clearly property of the estate." Trustee's Post-Trial Memorandum, p. 11. The Trustee cites *In re Mueller*, 256 B.R. 445 (Bankr. D. Md. 2000) as support for this argument. That case, however, is inapposite to the facts of this case.

In *Mueller*, the property at issue was the debtor's interest in a state employees' pension plan, which has no relation whatever to the loan repayments made to Benson and Mona Fischer in this case.[9] The Court declines to adopt the Trustee's argument regarding alleged deferred compensation. Here, there was no "deferred compensation" in the traditional sense. No agreement existed to pay Benson Fischer at a later date for services he performed while MBI was operational. Fischer simply did not take any salary during that period in anticipation of realizing an increase in the value of the MBI stock.

With regard to unjust enrichment, the parties agree on, and correctly state, the elements of such a claim:

> A benefit conferred upon the defendant by the plaintiff; [a]n appreciation or knowledge by the defendant of the benefit; and [t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Alternatives Unlimited, Inc. v. New Baltimore City Bd. of School Com'rs*, 843 A.2d 252, 299-300 (Md.App. 2004) (citations omitted).

The Trustee alleges that he stands in the shoes of Fischer with regard to this theory and that Fischer has a cause of action against MBI for unjust enrichment. This theory is also dependent on his assertion that Fischer was required to draw a salary. As

---

[9] In addition, the Court notes that in overruling the Chapter 7 trustee's objection to the debtor's exemption of the pension funds, the *Mueller* court held that the funds were both excludable from the debtor's estate under the Bankruptcy Code and exemptible from the estate under state law. *See* 256 B.R. at 447-448.

already noted, the Trustee does not point the Court to any legal authority that supports

this assertion, and the Court has not found any such authority either.

There is no dispute between the parties that the first two elements of an unjust

enrichment claim are met here:  Fischer's work conferred a benefit on MBI and MBI

knew of that benefit.  The Trustee's argument as to the third element is as follows:

> It is inequitable for MBI to accept the Debtor's services without
> appropriate compensation, regardless of whether the Debtor chose to work
> without compensation or simply deferred his compensation until MBI
> turned profitable.  .  .  .  .  The Trustee therefore has a legal and equitable
> claim against MBI for the Debtor's unpaid compensation on the basis of
> unjust enrichment.

Trustee's Post-Trial Memorandum, p. 12.  The theory, however, fails because Fischer

(and his wife) did indeed receive a benefit from the services he provided to MBI.  That

benefit was in the form of the additional equity appreciation of the MBI stock.  As stated

above, Benson and Mona Fischer acquired the stock for $500, and Benson valued the

stock in his bankruptcy schedules at $2 million. The increase in the value of the stock is

attributable, in part, to the services Benson Fischer provided to MBI.  Therefore, leaving

aside the Trustee's fraudulent conveyance claims discussed below, the fact that Benson

Fischer realized a substantial benefit from his work for MBI defeats the Trustee's unjust

enrichment claim.  Accordingly, the Court will deny the relief sought in Count I and will

enter judgment for Defendants.

### B.  Count II and the Joint Objection (Tenancy by the Entirety)[10]

Count II and the Joint Objection are based on the Trustee's contention that

Benson and Mona Fischer did not hold their MBI stock as tenants by the entirety.  The

record fails to support this claim.

---

[10] *See, supra*, fn. 3 and accompanying text.

As stated in the Introduction, Fischer timely filed an exemption in his bankruptcy case claiming the MBI stock was owned as tenants by the entirety. The commencement of a bankruptcy case creates an estate comprised of, among other things, all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1). Section 522(b)(2)(B)[11] exempts from bankruptcy administration "any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety . . . to the extent that such interest as a tenant by the entirety . . . is exempt from process under applicable nonbankruptcy law." Bankruptcy Rule 4003(a) requires that "a debtor shall list the property claimed as exempt under Section 522 of the Code on the schedule of assets required to be filed by rule 1007 . . . ." Fed. R. Bankr. P. 4003(a). Bankruptcy Rule 4003(b) permits a party in interest to file an objection to a debtor's listed exemptions. The "objecting party has the burden of proving that the exemptions are not properly claimed . . . ." Fed. R. Bankr. P. 4003(c).

"Maryland retains the estate of tenancy by the entirety in its traditional form." *Beall v. Beall*, 291 Md. 224, 234; 434 A.2d 1015 (1981) (citing *Columbian Carbon Co. v. Kight*, 207 Md. 203; 114 A.2d 28 (Md. 1955)). And although "the common-law principle of the unity of husband and wife had been at least modified by the Married Women's Acts [of 1860]" such that some case law recognizes the resultant severability of a married couple's rights in the use of common property, it has been expressly stated that "in none of those cases was it held that the quality of severability of the interest of the husband and wife in the use of the common property affected or abrogated the common-law estate of

---

[11] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8; 119 Stat. 23, renumbered this provision as 11 U.S.C. § 522(b)(3)(B). With some exceptions not applicable to this case, BAPCPA only applies to bankruptcy cases filed after October 17, 2005. *See* Pub. L. 109-8 § 1501. Accordingly, any citation to Title 11 herein is to the Bankruptcy Code as it stood prior to the BAPCA amendments.

16

tenancy by the entireties . . . ."  *Annapolis Banking & Trust Co. v. Smith*, 164 A. 157, 158-159; 164 Md. 8 (Md. Ct. of App. 1933).  "This estate, with its incidents, continues in Maryland as it existed at the common law."  *Id.* at 158.

Under Maryland common law, "a conveyance to husband and wife does not constitute them joint tenants, nor are they tenants in common.  They are, in the contemplation of the common law, but one person, and hence they take, not by moieties, but the entirety.  They are each seised of the entirety, and the survivor takes the whole."  *Marburg v. Cole*, 49 Md. 402, 411 (Md. 1878).

> The common-law rule is that the words which in a conveyance to unmarried persons constitute a joint tenancy will create, if the grantees are husband and wife, a tenancy by the entireties; . . . .  It is not because a conveyance or gift is made to husband and wife as joint tenants that the estate by entireties arises, but it is because a conveyance or gift is made to two persons who are husband and wife; . . . .  The marital relation, with its common-law unity of two persons in one, gives rise to this peculiar estate when a conveyance or gift is made to them without restrictive or qualifying words; and they hold as tenants by the entirety, not because they are declared to so hold, but because they are husband and wife.

*Brewer v. Bowersox*, 48 A. 1060, 1062; 92 Md. 567 (1901).

Creation of a tenancy by the entirety requires the four essential common law unities of interest, title, time, and possession.  More specifically, creation of such a tenancy requires that a husband and wife enjoy identical interests in and undivided possession of the relevant property, and that these identical interests arise at the same time.  *Cruickshank-Wallace v. County Banking & Trust Co*., 165 Md. App. 300, 312-313; 885 A.2d 403, 410-411 (Md. Ct. Spec. App. 2005) (citations omitted), *cert. den.* 391 Md. 114; 892 A.2d 477 (2006).

Under Maryland law, property held in a tenancy by the entirety is "exempt from process by creditors of an individual spouse."  *Schlossberg v. Barney*, 380 F.3d 174, 178

(4th Cir. 2004) (applying Maryland law). In addition, the usufruct, issues, rents, and profits of entireties property are also exempt from process by creditors of an individual spouse. *Annapolis Banking & Trust Co*, 164 A. at 159. However, entireties property is subject to the claims of a joint creditor of both husband and wife.[12] *See Cruickshank-Wallace*, 165 Md. App. at 312, n. 12 (citing *In re Carroll*, 237 B.R. 872, 874 (Bankr. D. Md. 1999); *see also Sumy v. Schlossberg*, 777 F.2d 921, 925 (4th Cir. 1985) (under Maryland law, entireties property can be used to satisfy joint obligations of husband and wife)).

The evidence at trial established that Benson and Mona Fischer held the MBI stock as tenants by the entirety. The record established the existence of the four essential common law unities of interest, title, time, and possession: Benson and Mona Fischer enjoyed identical interests in and undivided possession of the stock, and their interests arose at the same time. This conclusion was supported by the testimony of Sheldon Fischer, who was the Vice President of MBI, as well as the testimony of Mona Fischer. Both testified that Benson and Mona Fischer intended to own the stock as tenants by the entirety and, insofar they knew, did so hold it.[13] Their testimony was corroborated by Stanley Goldschmidt, the attorney who incorporated MBI. The evidence also included the Stockholder Agreement, which expressly stated that the interest would be held as tenants by the entirety.[14] Nothing in the record (apart from potentially the Trustee's

---

[12] In *United States v. Craft*, 535 U.S. 274, the Supreme Court, stating that "exempt status under state law does not bind the federal collector," held that the IRS could attach property held in a tenancy by the entirety to satisfy the tax debt of only one spouse. *Id.* at 288 (internal quotations and citation omitted).

[13] Benson Fischer also testified to this effect but, for the reasons stated in this opinion, the Court has grave doubts as to his credibility and therefore gives little weight to his testimony.

[14] The Stockholder Agreement contains two discrete references to the ownership status of Benson and Mona Fischer's interest in MBI: the document specifies that their shares of stock, constituting 50% of the corporation, "will be owned by Benson Fischer and Mona Fischer, as tenants by the entirety"; it further states that "Benson Fischer and Mona Fischer, as tenants by the entirety, hereby assign, pledge

argument concerning the Stockholder Agreement addressed below) provided any indication that the stock interest was conveyed to Benson and Mona Fischer in a form of ownership other than as tenants by the entirety.[15]

Against this weight of evidence, the Trustee asserts three theories in support of his contention that Benson and Mona Fischer do not hold their interest in MBI as tenants by the entirety: (1) the money used to purchase the stock interest was not held as tenants by the entirety; (2) certain language in the Stockholder Agreement establishes a clear intent by Benson and Mona Fischer to not hold their interest in MBI as tenants by the entirety; and (3) Benson Fischer's alleged fabrication and manipulation of the MBI stock certificates renders any such certificates unbelievable and inadmissible. The Court will address each contention in turn.

  1. *Source of funds for the MBI stock.*

The Trustee contends that because the funds used by the Fischers to purchase the MBI stock were not held as tenants by the entirety, then the stock itself could not be so held. The Trustee contends that the Fischers acquired the MBI stock with the funds that were used to make the Debtor Loan and that at least a portion of those funds was not owned as tenants by the entirety.  The Trustee concludes that since "the MBI Stock was 'bought' with the proceeds of the [Debtor Loan], . . . then the MBI Stock is not property held as tenants by the entireties."  Trustee's Post-Trial Memorandum, p. 19.

---

and hypothecate to Sheldon Fischer their shares of stock in the Corporation until such time as the Fischer Loan (including interest) is repaid in full." *See* PX 37, ¶¶ 1and 3

[15] Further, as Benson Fischer's counsel often pointed out at trial, and as described in the Findings of Fact, at the time Benson and Mona Fisher acquired their ownership interest in MBI, Fischer was facing considerable creditor recovery actions as a result of the Paley Rothman judgment.  Fischer was well aware of the protections afforded by owning the stock as tenants by the entirety. These facts lend additional circumstantial support to the finding that the Fischers intended to, and did, acquire their MBI interests as tenants by the entirety.

In fact, however, as the Court has already found, the Debtor Loan was a bona fide loan made by the Fischers to MBI, treated by MBI as such, and evidenced by a promissory note. Benson and Mona Fischer did not use the proceeds of the Debtor Loan to acquire the MBI stock. Therefore, the source of funds used to make the Debtor Loan is irrelevant to the Fischers's acquisition of the MBI stock.

As set forth in the Findings of Fact, the stockholders' initial capital investment in MBI was $1000. *See* Section II.B.1. The record did not establish the source of the funds used for this investment, although it did establish that all of Benson and Mona Fischer's funds were held in joint bank accounts at that time.

Finally, even if the Trustee had established that the funds used by Benson and Mona Fischer to acquire the MBI stock were not held as tenants by the entirety, his argument still fails. He does not cite any legal authority supporting his assertion that only funds held in a tenancy by the entirety can be used to purchase an interest to be held in a tenancy by the entirety.

### *2. Right of survivorship.*

The Trustee contends that Benson and Mona Fischer do not hold the MBI stock as tenants by the entirety because Mona Fischer does not hold the right of survivorship. The Trustee points to the language in the Stockholder Agreement, *see* Section II.B.2, which gives Sheldon Fischer the right to purchase Benson's shares upon Benson's death. According to the Trustee, this contract right deprives Mona Fischer of the right of survivorship and reflects an intention that the stock was not held as tenants by the entirety.

20

Sheldon Fischer's contract right to purchase Benson and Mona's stock upon Benson's death does not defeat Mona's right of survivorship.  Under a right of survivorship, ownership vests in the survivor upon the death of the decedent.  *See, e.g., Spessard v. Spessard*, 64 Md. App. 83, 91-92; 494 A.2d 701 (Md. Ct. Spec. App. 1985) (in a joint tenancy or tenancy by the entirety, on the death of one party, the other takes the whole estate).  Nothing in the Stockholder Agreement alters that right.  Sheldon Fischer does not succeed to ownership of Benson and Mona's stock upon Benson Fischer's death; Sheldon merely "shall have the right to purchase" the stock upon that event.  PX37, ¶6.  The option was entirely up to him.  In fact, it is precisely Mona Fischer's survivorship rights to the entirety of her and Benson's interest in MBI that required her agreement to join in the sale.  As the relevant language in the Stockholder Agreement makes clear, "Mona Fischer agrees that in the event of the death of Benson Fischer, she shall join in the sale of the shares to Sheldon Fischer . . . ."  *Id.*.  Moreover, the Trustee's contention that Sheldon's right to purchase the shares upon Benson's death evidences an intention that Benson and Mona Fisher would not hold the stock as tenants by the entirety is belied by the clear and unequivocal references in the agreement directly to the contrary.  *See, Id.*, ¶¶1,3.

### 3. The controversy over the MBI stock certificates.

Benson and Mona Fischer's MBI stock certificates were a source of much controversy both before and during the trial.  Initially, Benson Fischer identified DX 10 and 55 as being copies of the original certificates.  These copies stated that Benson and Mona Fischer owned 1000 shares of MBI stock as tenants by the entirety.  Fischer claimed these copies were found in a garage long after the roof collapsed at MBI.  The

Trustee contended that Fischer fabricated the copies marked as DX 55 and that he had dampened them to give them the crinkly appearance of having been left in cold storage. Until trial, no party had been able to produce original MBI certificates.

During trial, Sheldon Fischer produced for the first time allegedly original MBI stock certificates, marked as DX 57, 58 and 59.  DX 57 and 58 showed that Sheldon and Ann Fischer each owned 500 shares of MBI stock individually.  DX 59 showed that Benson and Mona Fischer owned 1000 shares of MBI stock as tenants by the entirety. [16]

Benson Fischer conceded, and a simple comparison reveals, that the copies which he had previously proffered as copies of original certificates (DX 10 and 55) were not in fact copies of the documents that were now being offered as original certificates (DX 57-59).  Fischer's explanation for the existence of copies of certificates which were not the newly-proffered originals was that when he created companies, Stanley Goldschmidt, his attorney, would send to him by facsimile stock certificates that he would sign and send back to the attorney to hold temporarily until Fischer could sign the original certificates. He offered that DX 10 and 55 were such copies.  This explanation was not supported by (among other things) Goldschmidt's testimony.  He incorporated at least five businesses for Fischer, including MBI.  He shared an office with Fischer and would hand Fischer the certificates to sign.  He did not recall incorporating any companies for Fischer after they stopped sharing office space, and did not recall ever faxing any stock certificates to either Benson or Mona Fischer.

Fischer's concession that the copies of the certificates (DX 10 and 55) were not in fact copies of the newly produced original certificates (DX 57-59) supported the

---

[16] The Trustee objected to the introduction of DX 57-59 on various grounds. The Court will exclude these exhibits for the reasons stated in Section G, *infra*.

Trustee's contention that, once again, Benson Fischer fabricated documents in a court proceeding. [17] Further, the Trustee contended that, as a result of the stock certificate machinations and based on Fischer's other testimony, the Court should conclude that Fischer lacks credibility and therefore should reject his testimony that he and his wife held their MBI stock as tenants by the entirety.

Based on Fischer's testimony concerning the stock certificates, as well as a host of evasive, misleading and glib answers on other subjects, the Court does indeed find that Fischer lacks credibility.[18] The problem with the Trustee's position, however, is that even if the Court were to disregard Fischer's testimony and also exclude from evidence the stock certificates produced by Sheldon Fischer, the remaining evidence was uncontroverted that Benson and Mona Fisher held their interest in MBI as tenants by the entirety.

The issue of whether Benson and Mona Fischer owned the MBI stock as tenants by the entirety was originally raised in the Joint Objection. As stated above, Count II of the Amended Complaint raises this same issue. The burden of proof is on the party objecting to an exemption, in this case the Trustee. Fed. R. Bankr. P. 4003(c). Further, in Maryland, any conveyance made to a husband and wife without restrictive or qualifying words is made to them as tenants by the entirety. *Brewer*, 48 A. at 1062. No evidence was produced that the conveyance of the MBI stock to Benson and Mona Fischer was made with "restrictive or qualifying words." Benson Fischer's lack of credibility alone is not sufficient to carry the Trustee's burden, overcome the presumption

---

[17] *See supra*, Section II.A.

[18] This finding is supported, by among other things, Fischer's filing of the *in forma pauperis* affidavit and his wholly unconvincing explanation for the existence of DX 10 and 55. As another example, on the second day of his testimony, Fischer apologized to the Court for his demeanor and answers during his first day of testimony – no doubt after having been taken to the proverbial woodshed by experienced counsel.

that the conveyance was made by the entirety, or – even if the burden were on the Fischers – rebut the remaining evidence that Benson and Mona Fischer held the MBI stock as tenants by the entirety.  The Court will enter judgment for the Defendants on Count II of the Amended Complaint and will enter an order overruling the Joint Objection.

### C.  Count VII (Maryland Spouses' Liability Act)

Alleging that the loan repayments made to Fischer and his wife "were transfers between spouses in prejudice of the rights of present creditors and therefore invalid" (Amended Complaint, p. 17, ¶ 105), the Trustee cites Maryland Code: Family Law, § 4-301, which, in relevant part, provides "[a] transfer of property between spouses is invalid if made in prejudice of the rights of present creditors." MD. CODE ANN., Family Law § 4-301(d)(2) (West 2009).  This count is dependent on the Trustee's allegation that the payments on the Debtor Loan made by MBI to Benson Fischer and Mona Fischer were merely "alleged" loan repayments, *i.e.*, not really loan repayments at all, but, rather, "transfers" from Benson Fischer to Mona Fischer.

As set forth in the Findings of Fact, the record established that the Debtor Loan was a bona fide loan made by Benson and Mona Fischer to MBI, and held by them as tenants by the entirety.[19]  *See* Section II. B.1.  Thus, the monthly paymentsrs were from MBI to Fischer and his wife as tenants by the entirety.  The Court will enter judgment for the Defendants on this count.

---

[19] To be sure, a portion of the funds used to make the Debtor Loan came from Mona Fischer individually. This fact, however, does nothing to establish that there was any transfer from Benson to Mona Fischer.

### D.  Count VIII (Maryland Fraudulent Conveyance Act)

In this Count, the Trustee asserts that Fischer "took alleged 'loan repayments' (the 'Transfers') from [MBI] in lieu of wages" (Amended Complaint, p. 17, ¶ 107).  The Trustee further asserts that the repayments made to Fischer and his wife on account of the Debtor Loan were really transfers – or, for purposes of the Trustee's fraudulent conveyance claim, "conveyances" – from Fischer to his wife.  The Trustee argues these "transfers" can be set aside under "Sections 15-201 *et seq*. of the Commercial Law Article of the Annotated Code of Maryland" (Amended Complaint, p.18).

The relevant provision of the Maryland Code – Title 15: Commercial Law (captioned as "Debt Collection – Special Provisions) is as follows:

§15-201.  Definitions.

\* \* \*

(c) "Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.

MD. CODE ANN., Commercial Law § 15-201(c) (West 2009).

In attempting to establish that Fischer conveyed an interest in property to his wife, the Trustee alleges that Fischer "intended to and attempted to convert non-exempt assets to exempt assets by voluntarily transferring each and every joint payment of $8,957.00 to himself and his wife under the guise of loan payments claimed to be held as tenants by the entireties to the prejudice of existing creditors and with the intent to hinder, delay and defraud his existing creditors."  Amended Complaint, p. 18, ¶ 113.  As with Count VII, the Trustee failed to meet his burden of proof at the very threshold: the allegations of "transfers" from Fischer to his wife on which this theory of recovery is based simply were not proved.  The Trustee did not establish that the payments by MBI on account of

the Debtor Loan were a conveyance from Benson to Mona Fischer.  The payments made by MBI to Fischer and his wife were payments on the Debtor Loan, which the Court has found to be a valid and bona fide loan.

In addition to his claim that the payments on the Debtor Loan were really salary, the Trustee alleges that "MBI's failure to pay compensation to the Debtor for his services . . . constitutes a fraudulent conveyance from the Debtor to the Debtor and his non-debtor spouse, [which] arises under either an actual fraud analysis or one relying on constructive fraud."  Trustee's Post-Trial Memorandum, p. 26.[20]  Under this theory, Benson Fischer's failure to take any salary, done with actual intent to hinder or delay his creditors, or while insolvent and for lack of fair consideration, transferred to himself and his wife nonexempt individual property (*i.e*., salary) to exempt jointly owned property (*i.e*., equity in MBI).

The evidence established that Benson Fischer failed to take a salary with an expectation that his equity interest in MBI would increase in value, which, as already noted, he expressly concedes.  *See, supra*, p. 11, fn. 8.  Thus, Fischer failed to take any salary with the intention of converting nonexempt salary to exempt stock held by the entirety.  The evidence also established that Fischer did so in bad faith and with actual

---

[20] Under Maryland law, an actual fraudulent transfer is defined as:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud present or future creditors, is fraudulent as to both present and future creditors. MD. CODE ANN., Commercial Law § 15-207 (West 2009).

A constructive fraudulent conveyance is defined as:

> Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation incurred without a fair consideration.  MD. CODE ANN., Commercial Law § 15-204 (West 2009).

intent to hinder or delay his creditors.  *See, supra,* Section II. B.2.[21]   The evidence further established that Fisher was insolvent at the time he incorporated MBI.[22]

    For purposes of analyzing the Trustee's claim, the Court assumes that Fischer's failure to take a salary with the intention of increasing the value of the MBI stock constitutes a "transfer" to Fischer and his wife because it converted the value of the services into the value of the stock.[23]   Further, Fischer did not receive fair consideration from Mona for the transfer to her of the value of his services.  The dispositive question that remains is:  Can personal services be deemed "property" for purposes of the Maryland fraudulent conveyance law?  The parties did not provide the Court with any legal authority on this question.

    The Court has not found any Maryland case law directly on point, but there is one case that touches the issue.  In *Sunderland v. Ebling*, 125 Md. 686; 94 A. 344, the Maryland Court of Appeals, citing cases and treatises, held that the "law implies no

---

[21] Maryland courts continue to apply the "badges of fraud" analysis to determine whether actual fraud exists.  Among the generally recognized badges of fraud are the insolvency or indebtedness of the transferor, lack of consideration for the conveyance, relationship between the transferor and the transferee, the pendency or threat of litigation, secrecy or concealment, departure from usual method of business, the transfer of the debtor's entire estate, the reservation of benefit to the transferor, and the retention by the debtor of the possession of the property. *In re Colandrea*, 17 B.R. 568, 580 (Bankr. D. Md. 1982).  Here, virtually all of the badges are present: The beneficiary of the transfer was Fischer's wife, Fischer received no consideration for the transfer, he agreed to not take a salary at a time that there were substantial unpaid judgments against him personally (which he was aware of), no persuasive testimony established that the MBI structure was Benson Fischer's (as opposed to Sheldon Fischer's) usual way of doing business, and Fischer retained the benefit of the value of his services.

[22] In Maryland, a person is insolvent if the "present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured."  MD. CODE ANN., Commercial Law § 15-202 (West 2009). The term "assets" is, in relevant part, defined as "property of a debtor not exempt from liability for his debts."  MD. CODE ANN., Commercial Law § 15-201(b)(1). (West 2009). Thus, in determining whether Fischer was insolvent with respect to his individual debts, such as the Paley Rothman judgment, the Court disregards the assets Fisher held with his wife as tenants by the entirety.

[23] It is established in Maryland law that, where one spouse uses individually owned, nonexempt funds to pay the principal on a mortgage loan on property held in a tenancy by the entirety, the creditors of the paying spouse can assert a fraudulent conveyance claim. *See Cruickshank-Wallace v. County Banking and Trust Co.*, 165 Md. App. 300, 328 and fn. 15; 885 A.2d 403 (Md. Ct. Spec. App. 2005).  Thus, the conversion of nonexempt property to exempt property can provide the basis for a fraudulent conveyance under Maryland law.

promise to pay for services rendered by members of a family to each other," and, further, that "[n]o action can be maintained for such services, in the absence of an express contract or engagement to pay for them." *Id*. at 345 (citations omitted).

> On this issue, the Fourth Circuit determined

> that the great weight of authority, in many other jurisdictions, approves the principle that a debtor, even though insolvent, has committed no fraud in law or in fact by giving his labor away, for by so doing he has not concealed, withheld or disposed of anything on which his creditors have any claim in law or in equity; and, generally, this rule applies with equal force although the relationship of the debtor and his employer is that of husband and wife.

*Studds v. Fidelity and Deposit Co. of Md.*, 267 F.2d 875, 876 (4th Cir.) (citing 28 A.L.R. 1046 and 37 C.J.S. Fraudulent Conveyances), *cert. den.* 361 U.S. 876 (1959). And the Fourth Circuit further stated "that Virginia has adopted the majority view . . . ." *Id*. at 877 (citing *Childress v. Fidelity & Cas. Co. of NY*, 194 Va. 191; 72 S.E.2d 349, 353 (1952)).

The relevance of this majority view to the case at bar is best summed up by the Supreme Court of Alabama: "Manifestly, such a donation of labor or services presents no analogy to a donation of property which is subject to the claims of creditors, and the rules of law that govern fraudulent conveyances can have no application." *Most Worshipful Grand Lodge of Alabama Ancient Free and Accepted Masons v. Allen*, 208 Ala. 292; 94 So. 343, 344 (1922). *See also Krebs v. Lay*, 222 Or. 278; 352 P.2d 577 (1960); *SASCO 1997 NI, LLC v. Zudkewich*, 2007 WL 1827257 at 16-18 (N.J. Super. A.D. 2007) (citing cases, including *Studds, supra*).

The Court will enter judgment for the Defendants on this count.

### E.  Claim Nos. 15 and 16 (in Bankruptcy Case No. 03-13704)

The Trustee filed a claim on behalf of Sheldon Fischer (Claim No. 15) and, in response, Sheldon and Ann Fischer filed a Reply to Proof of Claim Filed by Trustee, which stated that they "never requested that [the Trustee] do so" and that they "do not want the Trustee to administer the claim on their behalf."  Docket No. 383 at p.1.  The Trustee also filed Claim No. 16 on behalf of the Posners.  In response, the Posners filed a Reply to Proof of Claim Filed by Trustee in which they stated that they "never requested that [the Trustee] do so" and that they "do not want the Trustee to administer the claim on their behalf."  Docket No. 385 at p. 1.  The Trustee has not cited any authority that would obligate a creditor who does not want its claim administered to subject its claim to bankruptcy administration.  Accordingly, the Court will disallow Claim Nos. 15 and 16.

### F.  Exclusion of DX 57-59

In Section III.B.3, the Court addressed at some length the controversy over Benson and Mona Fischer's MBI stock certificates.  These issues were also addressed in the Order Denying as Moot Motion to Determine that Sheldon Fischer Waived the Attorney-Client Privilege (Docket No. 234 in Adv. Pro. 05-01011, entered June 19, 2007) (the "June 19 Order").  In the June 19 Order, the Court excluded DX 10 and 55 for the following reason:

> As pertinent to this ruling, [Benson Fischer] has stipulated that the copies of the MBI certificates (DX 10 and DX 55) which he previously proffered to be copies of original certificates, are not, in fact, copies of DX 57-59. Therefore, DX 10 and DX 55 are not "duplicates" -- as that term is defined in Fed R. Evid. 1001(4) -- of the certificates that the Debtor now contends are the actual, original certificates. Accordingly, DX 10 and DX 55 are not admissible as duplicates of DX 57-59. See Fed. R. Evid. 1002; 1003. Further, a "genuine question" has been raised as to the authenticity and availability of the original document of which DX 10 and DX 55 are duplicates. See Fed. R. Evid. 1003.  Accordingly, DX 10 and DX 55 are

> not admissible as duplicates of the unavailable, unidentified original
> document from which they were duplicated.

June 19 Order at p. 5 (footnote omitted).  The Court deferred ruling on the admissibility of DX 57-59.  For the reasons set forth herein, the Court will deny the admissibility of DX 57-59.

DX 57-59 were produced for the first time in this litigation midway through trial. They were produced by Sheldon Fischer, who was the Chairman and Vice President and (according to the exhibits themselves) the Secretary-Treasurer of MBI, a party defendant. There is no dispute that the exhibits were the subject of discovery requests, and that they certainly were important, highly relevant documents.  Under these circumstances, the late production of these documents constitutes unfair prejudice and surprise to the Trustee. *See* Fed. R. Evid. 403.

**G.  Motion to Dismiss (in Bankruptcy Case No. 03-13704)**

In the Motion to Dismiss, Fischer argues that cause exists to dismiss this case because "there are no assets available to satisfy the claims of [Fischer's] unsecured creditors and there will be no distribution in this case."  Motion to Dismiss, p. 2, ¶ 7. Based on the record, however, the Court will deny the Motion to Dismiss.

The Hartford Fire Insurance Company ("Hartford") filed a claim (Claim No. 7) that appears to constitute a debt of Fischer's on which his wife is also a co-obligor. Hartford initially filed Claim No. 2 in this bankruptcy case, based on a "Contingent subrogation claim based upon indemnity agreement re: appeal bond" that arose out of an action in Montgomery County Circuit Court captioned as *The Fischer Brewing Co., et al. v. Paley, Rothman, et al.* (Case No. 218733).  By order of that court, the full amount of

that appeal bond ($30,134.95) was ultimately tendered to Paley Rothman, which, in turn, executed an assignment of the full amount to Hartford.

The "General Indemnity Agreement" which is attached to the Appeal Bond (filed with both Claim No. 2 and Claim No. 7) includes a list of the indemnitors with their signatures and identifying information. This list is preceded by the following statement: **"WE HAVE READ THIS INDEMNITY AGREEMENT CAREFULLY. THERE ARE NO SEPARATE AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OUR OBLIGATIONS AS ABOVE SET FORTH."** (capitalization and boldface in original). Fischer's wife, Mona Fischer, is one of the Indemnitors.

Claim No. 7 is based in part on the indemnity agreement. Attached to it is a document dated February 22, 2005 stating that since its payment of the $30,134.95 to Paley Rothman, "Hartford has received $15,543.39 from Stanley Goldschmidt, a co-obligor on that bond." Claim No. 7, which Hartford refers to as an "Amended Proof of Claim," lists the original claim of $30,134.95 and specifies $14,591.56 (the remainder after Stanley Goldschmidt's payment is subtracted) as its unsecured nonpriority claim.

On September 1, 2004, Fischer filed the Motion to Dismiss, in which he stated that "there is only one joint unsecured debt for a small amount. That is the claim for Hartford Insurance on a surety bond. This claim has been paid by co-debtor, Stanley Goldschmidt." Renewed Motion, pp. 1-2, ¶ 4. Other than the partial payment made by Goldschmidt, however, the record is devoid of evidence of any additional payments. Further, the proof of claim filed by Hartford has not been withdrawn, and no objection to it has been sustained. Therefore, there appears to be at least $14,591.56 of unsecured debt jointly owed by Fischer and his wife, which amount of their tenants-by-the-entirety

31

property is subject to administration by the Trustee for the benefit of creditors. Accordingly, dismissal of this bankruptcy case is inappropriate.

Furthermore, the Court notes that the Trustee has intervened as a party in a pending action in D.C. Superior Court which may result in further recovery by the Trustee that would benefit creditors of Benson Fischer, thereby making dismissal even more inappropriate at this point. For these reasons, the Court will deny the Motion to Dismiss.

## CONCLUSION

For the foregoing reasons, the Court will: (1) deny the relief sought in the Amended Complaint and enter judgment in favor of Defendants; (2) overrule the Joint Objection; (3) disallow Claim Nos. 15 and 16, and sustain the objections thereto; (4) exclude DX 57-59; and (5) deny the Motion to Dismiss.

**Copies To:**

Richard E. Schimel, Esq.
7315 Wisconsin Avenue, Ste. 00
Bethesda, MD 20814-3206

Roger Schlossberg, Esq.
134 West Washington Street
Hagerstown, MD 21741-4227

Gary Posner, Esq.
7 Saint Paul Street
Baltimore, MD 21202-1626

Harvey A. Levin, Esq.
1909 K Street, NW
Washington, DC 20006

Alan Mark, Esq.
4800 Hampden Lane
Bethesda, MD 20814

Lynn Kohen, Esq.
Office of the U.S. Trustee
6305 Ivy Lane, Ste.600
Greenbelt, MD 20770

**END OF MEMORANDUM**