Date signed July 09, 2010



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re | * | |
| Benson J. Fischer, | * | Case No. 03-13704 |
| | * | |
| Debtor | * | Chapter 7 |

### MEMORANDUM OF DECISION

Before the Court is the Motion for Reconsideration of Oral Ruling Denying Without Prejudice Trustee's Motion for Authority to Consummate Proposed Purchase (the "Motion to Reconsider") (Docket No. 451) filed by Roger Schlossberg, the Chapter 7 trustee (the "Trustee"). The Trustee asks the Court to reconsider its denial without prejudice of the Trustee's Motion for Authority to Consummate Proposed Purchase (the "Purchase Motion") (Docket No. 404). The Debtor, Benson J. Fischer (the "Debtor"), objects to the Motion to Reconsider and the Purchase Motion.

In the Purchase Motion, the Trustee sought Court approval to acquire a judgment against the Debtor and his nondebtor spouse in order to augment the estate. After a hearing on June 8, 2010, the Court denied the Purchase Motion without prejudice, and ruled that it would reconsider

its ruling if (1) all of the administrative claimants who are owed funds from the estate – and who would otherwise be the recipients of the funds used to make the acquisition – supported the Purchase Motion; (2) the Office of the United States Trustee continued to support the Purchase Motion; and (3) the Trustee made an evidentiary record that established that the acquisition of the judgment is prudent and reasonable under the circumstances.

On June 25, 2010, the Trustee filed the Motion to Reconsider and submitted statements by all of the administrative creditors of the estate. Each "fully supports" the Purchase Motion. Further, the Purchase Motion is supported by all creditors who have filed a response to it. These creditors hold 78% of the unsecured claims in the case. No creditor objects. The Office of the United States Trustee continues to support the Purchase Motion. The sole objection to the Purchase Motion is by the Debtor, who will not receive a distribution from the estate.

The Court held an evidentiary hearing on July 8, 2010. For the reasons stated herein, the Court will grant both the Motion to Reconsider and the Purchase Motion, and will authorize the Trustee to acquire the judgment.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The following constitutes the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

The Debtor commenced his bankruptcy case by filing a voluntary petition under Chapter 7 on March 28, 2003. Roger Schlossberg (the "Trustee") was appointed as the successor Chapter 7 trustee on December 10, 2004 and has administered the case ever since. This case has a substantial history and a significant part of that history has been litigation conducted by the

Trustee and other parties.  The two litigation actions pertinent to the motions currently before the Court are the Traverse Action (filed in connection with *Fischer v. Estate of Flax*, Case No. 01-CV-184) (District of Columbia Superior Court) and the MBI litigation (*Montgomery Bakers, Inc., et al. v. Montgomery Distributors, Inc., et al.* (Case No. 279074-V) (Circuit Court for Montgomery County).  These actions are the bases for the subject matter of the motions now before the Court and, accordingly, the Court will describe the relevant aspects of those actions.[1]

### The Trustee's Acquisition of Proceeds from the Traverse Action

The Debtor and others sued Howard L. Flax, the law firm of Paley, Rothman, Goldstein, Rosenberg & Cooper ("Paley Rothman"), and Paley Rothman attorney Alan S. Mark, in D.C. Superior Court for fraud, negligent misrepresentation, tortious interference, and other alleged misconduct.  Judge Steffen Graae granted summary judgment to Paley Rothman and Mark (hereafter collectively "Paley Rothman").  The Flax estate, as successor to Howard Flax, obtained an award of $300,000 in damages on its counterclaim.  Judge Graae then awarded some $930,000 in attorney's fees and costs, together with $40,000 in punitive damages, on the defendants' counterclaim for bad faith litigation.  *See Fischer v. Estate of Flax*, 816 A.2d 1, 3 (D.C.Ct. App. 2003).  These judgments were entered against the Debtor individually.  The Debtor filed a motion to set aside these awards, which Judge Graae denied.  *See Goldschmidt v. Paley Rothman*, 935 A.2d 362, 366 (D.C.Ct. App. 2007).

In an attempt to execute on its judgment, Paley Rothman served a writ of attachment on Montgomery Bakers, Inc. ("MBI"), as the Debtor's employer, directing it to withhold twenty-five percent (25%) of the Debtor's disposable wages for each pay period.  MBI answered the writ and Paley Rothman's interrogatories with denials that the Debtor was or ever had been an

---

[1] For lengthier and more detailed discussions of the litigation background of this bankruptcy case, *see* Memorandum Decision at Docket No. 152 in Adv. Proc. No. 03-1222 (1/14/09) and Memorandum of Decision at Docket No. 255 in Adv. Proc. No. 05-1011 (1/28/09).

employee of MBI.  Paley Rothman then requested a traverse hearing[2] pursuant to D.C. Code §16-553 (the "Traverse Action").  The request was granted and the Superior Court held hearings on July 18, 2002 and October 22, 2003.

On February 7, 2005, during the pendency of the Traverse Action, Paley Rothman assigned its prospective recovery from the Traverse Action to the Trustee.  *See* Assignment Agreement, Docket No. 406-1.  Under the Assignment Agreement, Paley Rothman gave up 100% of the pre-petition recoveries from the Traverse Action and 25% of the post-petition recoveries.  It also gave up all right to direct or control the Traverse Action.  The Trustee assumed the burden of controlling the Traverse Action and assumed the obligation to pay the fees and expenses of the Traverse Action.

Although the Superior Court initially denied the relief sought in the Traverse Action, the D.C. Court of Appeals vacated the part of the decision denying enforcement of the writ of attachment and remanded for further proceedings.  *See Goldschmidt*, 935 A.2d at 382.

On remand to the Superior Court, Judge Graae conducted a two-day trial. Senior Judge Leonard Braman conducted a third trial day and ultimately issued written findings of fact and conclusions of law.  Judge Braman ruled against MBI and granted judgment based on the reasonable value of Debtor's services to MBI, which the court valued at $396,932.  In addition, the court awarded prejudgment interest at 6% per annum from Nov. 8, 2001 through Jan. 5, 2010.  Lawrence E. Carr III, Esq., the receiver appointed by the court for the dissolution of MBI,

---

[2] "If a garnishee answers to interrogatories that he does not have property or credits of the defendant, or has less than the amount of the plaintiff's judgment, the plaintiff may traverse the answer as to the existence or amount of the property or credits, and the issue thereby made may be tried as provided by section 16-551. . . .  D.C.Code § 16-553 (emphasis deleted)   .  .  .  .  A traverse is the statutory challenge to the accuracy and/or veracity of a garnishee's answers to interrogatories that accompany writs of attachment.  *See* § 16-553 ('If a garnishee answers to interrogatories. . ., the plaintiff may traverse the answer as to the existence or amount of the property or credits [in garnishee's hands], and the issue thereby made may be tried as provided by section 16-551.')."

*Pride Transport, Inc. v. Northeastern Pennsylvania Shippers Co-op. Ass'n, Inc*.  832 A.2d 163, 169 (D.C. Ct. of App. 2003).

subsequently paid $600,000 to the Trustee (the "Traverse Judgment Proceeds") in satisfaction of the Traverse Action judgment.

### *The Asset the Trustee Seeks to Purchase: the MBI Judgment*

Also during the course of the Traverse Action, MBI brought suit against the Debtor, his wife and Montgomery Distributors, Inc. ("MDI") (a company incorporated by the Debtor and his wife) in the Circuit Court for Montgomery County (the "Circuit Court").  *See Montgomery Bakers, Inc., et al. v. Montgomery Distributors, Inc., et al.* (Case No. 279074-V).  MBI sued on a theory of unjust enrichment, seeking to recover certain profits MDI realized from a distribution agreement with Starbucks and distributed to the Debtor and his wife, who counter-claimed for dissolution of MBI.  The Circuit Court found in favor of MBI on its claim for unjust enrichment and awarded MBI a judgment against MDI, the Debtor and his wife, jointly and severally, in the amount of $654,257.  This amount equaled 50% of the profits generated by the distribution agreement with Starbucks.  On the counterclaim for dissolution, the court ruled in favor of the Debtor and his wife, and appointed Mr. Carr as MBI's receiver for purposes of winding up its affairs.

The Debtor and his co-defendants appealed the circuit court's judgment and MBI cross-appealed as to the amount of damages awarded.  The Court of Special Appeals of Maryland affirmed the trial court's judgment as to liability but reversed and remanded on damages, holding that MBI was entitled to recover 100%, not 50%, of the profits MDI derived from its distribution agreement with Starbucks.

On remand, the circuit court entered judgment in favor of MBI – and against the Debtor, his wife, and MDI jointly and severally –  in the amount of $1,308,514 with post-judgment

interest at the legal rate of 10% per annum accruing *nunc pro tunc* from Apr. 8, 2008, the date of the original judgment (collectively, the "MBI Judgment"). *See* Notice of Amended Judgment (Docket No. 404-2). In the Purchase Motion, the Trustee seeks to acquire the MBI Judgment for $320,000.

***The Administrative Claims of the Estate***.

The current administrative claims of the estate, if allowed in full, substantially exceed the funds the Trustee holds for distribution. The Trustee has recovered $625,000 for the estate, which consists of the $600,000 Traverse Judgment Proceeds plus a $25,000 recovery from another matter. *See* Trustee's Ex. 14. The current administrative expenses total $1,283,934.59, including the $200,000 contingency fee on the Traverse Action. Trustee's Ex. 15.

Leaving aside Paley Rothman's claim for the post-petition recoveries on the Traverse Action, discussed further below, the administrative claims consist exclusively of professional fees incurred through the Trustee's administration of the estate. The vast majority of these are legal fees incurred in the various litigation matters brought by the Trustee.

The Trustee testified that the professionals accepted the representation with knowledge that the estate was not able to pay them unless the Trustee succeeded in the litigation. According to the Trustee, such fee arrangements are the only way a trustee can pursue actions on behalf of an estate that has no ability to pay legal fees on an ongoing basis. Each of these administrative creditors "fully supports" the Trustee's proposed acquisition of the MBI Judgment, *see* Docket Nos. 451-2, pp. 1-5; 451-3, p.1. If the Trustee is successful in augmenting the estate through the MBI Judgment, these administrative claimants stand to be paid in full on their claims, a result that will not currently occur.

Recognizing that the costs of administration have exceeded recoveries, the Trustee proposes a fee arrangement in which the costs of pursuing recovery on the MBI Judgment will be deferred until the estate recovers the $320,000 it pays for the MBI Judgment. Only then will the costs of pursuing the MBI Judgment be paid. In this way, the current claimants do not share in the costs of pursuing the MBI Judgment until the funds the estate uses to acquire the MBI Judgment have been recovered.

The Debtor points to the unpaid administrative claims and argues that the Trustee has acted improperly in bringing litigation claims against the Debtor when the estate could not pay the legal fees on an ongoing basis. But, as stated above, because the estate had no non-exempt assets, these claims could not otherwise have been brought. The professionals were aware of the estate's financial position and accepted the representation knowing payment would have to come from recoveries.

Moreover, the Trustee's actions had merit. He successfully recovered $600,000 from the Traverse Action. Further, although the Court ruled against the Trustee after a lengthy trial on a consolidated adversary proceeding and contested matter, *see* Memorandum of Decision (Docket No. 397), the Trustee's claims were certainly colorable and worthy of pursuit. In any event, the administrative claims will not be paid until the professionals file fee applications and the Court approves a fee.

### *Procedural History of the Purchase Motion.*

In the Purchase Motion, the Trustee seeks authorization to purchase the MBI Judgment for $320,000. The Trustee filed the Purchase Motion on March 26, 2010. After numerous filings by the Debtor and the Trustee, and after the Court granted a continuance of the hearing on the Debtor's request, the Court held a hearing on the Purchase Motion on June 8, 2010.

In a bench ruling issued on June 11, 2010, the Court denied the Purchase Motion, ruling that the Trustee had offered no evidence or testimony from which the Court could find and conclude that the acquisition of the MBI Judgment was a prudent and reasonable use of estate funds.  *See* Docket No. 449 at p.6.  However, the only objector to the Purchase Motion was the Debtor, and his motivation for objecting to the purchase of the MBI Judgment was apparent. Indeed, the Debtor's standing to object to the Purchase Motion was questioned by the Court.  *See id*. at p.6.  Moreover, the largest creditors of the estate and the Office of the United States Trustee supported the Purchase Motion.  Accordingly, the Court denied the Purchase Motion without prejudice, and ruled that it would reconsider its ruling if (1) all of the administrative claimants who are owed funds from the estate supported the Purchase Motion; (2) the Office of the United States Trustee continued to support the Purchase Motion; and (3) the Trustee made an evidentiary record that established that the acquisition of the MBI judgment is prudent and reasonable under the circumstances.  *Id*. at pp. 6-8.  The Court stated that if the Trustee met the first two conditions and filed a motion to reconsider the ruling, it would set the matter for an evidentiary hearing on an expedited basis, considering that the Purchase Motion had been pending for some time.

The Trustee filed the Motion to Reconsider on June 25, 2010.  The Trustee submitted with the Motion to Reconsider statements by all of the administrative creditors of the estate.  All support the Purchase Motion.  The Office of the United States Trustee continues to support the Purchase Motion.  *See* Docket No. 444.   Accordingly, the Court set the Motion to Reconsider for an evidentiary hearing on July 8, 2010.

At the hearing the Trustee testified at length on the reason he seeks to acquire the MBI Judgment and why it is in the best interests of the estate to do so. The Court will make its factual findings on this point in the applicable discussion under Conclusions of Law below.

## CONCLUSIONS OF LAW

### *The Debtor Lacks Standing to Object to the Purchase of the MBI Judgment*

Throughout the contested matter initiated by the filing of the Purchase Motion, the Court allowed the Debtor to participate fully in the proceedings. Thus, the Debtor filed an opposition to the motion (Docket No. 406), a motion to continue the originally scheduled hearing, which the Court granted (Docket Nos. 414, 434) and a supplemental opposition to the motion (Docket No. 436). The Debtor, through counsel, actively participated at the hearing on the Purchase Motion and the hearing on the Motion to Reconsider. Although the Court raised the issue of the Debtor's standing, it nevertheless allowed the Debtor to participate without restriction. Notwithstanding the Court's willingness thus far to allow the Debtor to participate, however, it is apparent that the Debtor lacks standing to object to the Purchase Motion.

It is well established that an insolvent Chapter 7 debtor lacks standing to challenge case administration matters because the debtor lacks a pecuniary interest in the distribution of assets among the debtor's creditors. In *Willemain v. Kivitz*, 764 F.2d 1019, 1022 (4th Cir. 1985), the court held that an insolvent Chapter 7 debtor lacks standing to challenge the proposed sale of estate property because the debtor lacks a pecuniary interest in the result of the sale. In reaching its decision, the court relied on the principle, in the analogous setting of whether an insolvent debtor may object to the allowance of claims against the estate, that "an insolvent debtor is not a

9

party in interest and thus lacks standing because he has no pecuniary interest in the distribution of his assets among his creditors." *Id.* (citing 3 J. Moore & L. King, Collier on Bankruptcy ¶57.17[2.1], pp. 275-277 (14th ed. 1977); *see also Yadkin Valley Bank and Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 756 (4th Cir. 1993) (the term "party-in-interest" is "generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceeding.").

Here, there is no chance that the Debtor will receive a distribution from the estate. As stated above, the Trustee has recovered and holds $625,000 for the estate. The total unsecured creditor claims against the estate are $1,462,689.04. *See* Trustee's Ex. 16. Accordingly, there is no likelihood that the Debtor could receive a distribution from the estate as currently constituted.

Further, the Debtor will not receive a distribution from the estate even if the Trustee goes forward with the purchase of the MBI Judgment and recovers it in full. The Trustee's analysis of the amounts available for distribution to the unsecured creditors is set forth in Exhibit 17 and was supported by his testimony, which this Court accepts. That analysis shows that the amount available for distribution to the $1.4 million of unsecured creditors' claims will be $259,226, assuming the Trustee recovers the entire $1.7 million of the MBI Judgment. Trustee Ex. 17. That amount is after payment of $983,934.59 of administrative claims[3] and the anticipated costs of collection on the MBI Judgment. *Id.*

The Debtor argues at some length that the largest of the administrative claims ($900,000 for the law firm of Whiteford Taylor) is not bona fide. But that issue will be addressed as necessary in the context of fee applications. For purpose of this analysis, even if the Whiteford Taylor administrative claim is eliminated in its entirety, the amount available for distribution

---

[3] The Trustee testified the current administrative claims exceed $1 million, see Trustee's Ex. 15, but he hopes to reduce them by negotiation. If he is unsuccessful in that effort, obviously less would be available for the unsecured creditors. In either event, nothing would be paid to the Debtor.

would not be sufficient to pay the $1.4 million of unsecured claims in full and the Debtor would not receive a distribution from the estate.   Accordingly, the Debtor has no pecuniary interest in the estate or the Trustee's purchase of the MBI Judgment.

To be sure, as the judgment debtor on the MBI Judgment, the Debtor seeks to prevent the Trustee from acquiring the MBI Judgment in order to keep the Trustee from pursuing the Debtor's exempt assets.  And it plainly is in this capacity that the Debtor objects to the Purchase Motion.  But the issue raised by the Purchase Motion is whether the purchase of the MBI Judgment is in the best interests of the estate.  Whether the Debtor has standing depends on whether the Debtor has a pecuniary interest in the estate, and not on whether the Debtor seeks to block the Trustee's acquisition of the MBI Judgment for his personal, tactical reasons.  This Court's interest and concern is with the administration of the case and the best interests of the estate.  The Debtor's personal capacity as a judgment debtor on the MBI Judgment is not at issue here.  Accordingly, the Debtor lacks standing to object to the Purchase Motion.  *See Willemain*, 764 F.2d at 1022.

The Court's conclusion that the Debtor lacks standing is alone sufficient to deny the Debtor's objection to the Purchase Motion.  Nevertheless, the Court will address the substantive objections made by the Debtor.

### The Traverse Judgment Proceeds are Property of the Estate.

The Debtor contends that the funds the Trustee proposes to use to purchase the MBI Judgment (*i.e.*, a portion of the $600,000 Traverse Judgment Proceeds) are not property of the estate.  Specifically, the Debtor argues that "the $600,000 [Traverse Judgment Proceeds] which Trustee Schlossberg now holds does not fall within the ambit of 11 U.S.C. §541(a)."  *See* the Debtor's Opposition (Docket No. 406), p. 21, ¶ 46.  This is clearly incorrect.

Section §541(a)(7) of the Bankruptcy Code plainly provides that property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. §541(a)(7). Here, the Trustee took an assignment of the Traverse Action, prosecuted it, prevailed and now holds the $600,000 Traverse Judgment Proceeds. These funds are unquestionably property of the estate.

The Debtor relies on *In re Gallucci*, 931 F.2d 738 (11th Cir. 1991). In that case the Eleventh Circuit held that property that a Chapter 7 trustee acquired by gift was not property of the estate. In so holding, the court expressly stated: "We do not believe, however, that Congress intended section 541(a)(7) to extend to gifts of property having no connection to the debtor a*nd not contracted for by the estate* . . . ." *Id.* at 743 (emphasis added). This holding does not support the Debtor's position here because the Trustee took the assignment pursuant to the Assignment Agreement. In it, Paley Rothman gave up 100% of the pre-petition recoveries from the Traverse Action and 25% of the post-petition recoveries. It also gave up all rights to direct or control the Traverse Action. The Trustee assumed the burden of controlling the Traverse Action and assumed the obligation to pay expenses of the Traverse Action. The Assignment Agreement clearly was supported by consideration.

The leading case in this Circuit on this issue is *In re Bogdan*, 414 F.3d 507 (4th Cir. 2005), *cert. denied sub nom. Stewart Title Guaranty Co. v. Logan*, 546 U.S. 1093 (2006). There, the Chapter 7 trustee filed an adversary proceeding against the debtor's co-conspirators as the assignee of mortgage lenders who had been injured by a real estate "flipping scheme" in which the debtor also participated. The bankruptcy court dismissed the complaint on the grounds that the trustee lacked standing and the district court affirmed, ruling that the trustee lacked standing notwithstanding the assignment of the causes of action to the trustee. *See Bogdan*, 414 F.3d at

12

510.  In reversing, the Fourth Circuit concluded that the district court's "per se ban on trustee suits based on assignments from creditors" was unsupported by law.  *Id*. at 512.

    As a threshold matter, the Fourth Circuit ruled that the "unconditional assignments acquired by Bogdan's trustee from the mortgage lenders after commencement of this bankruptcy case constitute property of the estate that the trustee is authorized to collect and reduce to money on behalf of the estate."  *Id*. (internal quotations omitted).  The court then explicated the relevant aspects of the assignments from Bogdan's creditors which conferred standing on the trustee to pursue those causes of action.

    The Fourth Circuit noted that "the assignments [the trustee] obtained do not reserve any part of the potential recovery exclusively for the mortgage lenders that assigned their claims" and that those lenders would recover, "if at all, by sharing from the general assets of the estate on a pro rata basis with all other creditors."  *Id*. at 513.  Therefore, the trustee was "seeking to collect money . . . as assignee and representative of the estate, not money owed to specific creditors. Accordingly, Bogdan's estate is the real party in interest in this adversary proceeding."  *Id*.  The *Bogdan* court also relied on the fact that the adversary proceeding brought by the trustee was "directly related to the bankruptcy case."  *Bogdan*, *supra*, at 513.

    The Court first notes that there is a timing difference between this case and *Bogdan* that makes the *Bogdan* rationale inapplicable to the Debtor's contention that the Traverse Judgment Proceeds are not property of the estate.  In *Bogdan*, the trustee's standing under the assignment was initially determined by the bankruptcy court in which the adversary proceeding was brought, and was ultimately resolved by an appeal from that decision.  Here, the Debtor contends that the Trustee lacked standing to prosecute the Traverse Action.  But Paley Rothman assigned its interest in the Traverse Action to the Trustee on February 7, 2005 and that action was pending

13

and ultimately resolved by the Superior Court for the District of Columbia.  The Trustee did, in

fact, prosecute the Traverse Action[4] and obtained the Traverse Judgment Proceeds.  The

Traverse Action is concluded.  It is too late and in the wrong court for the Debtor to challenge

here the Trustee's standing in the Traverse Action, and the Debtor's attempt to link the Trustee's

alleged lack of standing to his property of the estate argument is unavailing.

In any event, Paley Rothman's assignment to the Trustee of the Traverse Action was

proper under the *Bogdan* rationale. In the Assignment Agreement, Paley Rothman

> waives in favor of the Trustee all rights to direct any litigation regarding
> the Traverse [Action] and to make all decisions related to the further
> prosecution of the Traverse [Action], except to retain the same rights as any
> creditor, including the right to object to any proposed settlement filed under
> Rule 9019.

Assignment Agreement, p. 2, ¶K.  Thus, at least insofar as ceding control of the Traverse Action

is concerned, Paley Rothman's assignment was unconditional.  Further, under the Assignment

Agreement, Paley Rothman was no longer responsible for the legal fees and expenses incurred

by the Trustee in connection with the Traverse Action. Although the attorney fee arrangement

remained on a contingency fee basis, under the Assignment Agreement the estate became liable

for the litigation expenses.

In the Traverse Action, Paley Rothman, and then the Trustee, sought to recover from

MBI the value of the Debtor's services for which he was not paid.  A portion of the period during

which wages were not paid was pre-petition and a portion was post-petition (and therefore likely

not property of the estate).   Paley Rothman and the Trustee agreed that 100% of the pre-petition

recovery was assigned to the Trustee and under the exclusive control of the Trustee.  Therefore,

again like in *Bogdan*, the assignment of the pre-petition recovery was unconditional and Paley

---

[4] Debtor contended that the Trustee did not prosecute the Traverse Action, but the Trustee's testimony at the June 8, 2010 hearing, accepted by the Court, plainly rebutted that contention.

Rothman will only "shar[e] from the general assets of the estate on a pro rata basis with all other creditors." *Bogdan*, *supra*, at 513.

To be sure, Paley Rothman retained for itself 75% of the post-petition recovery, while the Trustee retained 25%. *See* Assignment Agreement, ¶ J. It is apparent that the parties' distinction between pre-petition recoveries and post-petition recoveries was in recognition of the effect of the Debtor's bankruptcy filing. The Trustee testified that he retained 25% of the post-petition proceeds to compensate the estate for the burden of conducting the litigation and incurring the expenses of litigation. Paley Rothman's retention of this post-petition interest is alone not sufficient to bring the assignment outside the ambit of *Bogdan*. What is more important, in the Court's view, is that Paley Rothman unconditionally assigned the pre-petition proceeds from the Traverse Action, which is the interest that implicates the bankruptcy estate. And in any event, Paley Rothman's 75% share of the post-petition recovery equals only $92,625, which is a small portion of the Traverse Judgment Proceeds.

Moreover, since the time the Assignment Agreement was executed, the Trustee and Paley Rothman have operated on the understanding that the Trustee would collect 100% of any recoveries from the Traverse Action, and that Paley Rothman would have an administrative claim in the case equal to 75% of the post-petition portion of the proceeds of the Traverse Action. Consistent with this understanding, the Trustee has collected the entire Traverse Judgment Proceeds. Paley Rothman holds an administrative claim in the amount of $92,625, which represents 75% of the post-petition portion of the Traverse Action Proceeds. Thus, the Trustee is administering even the post-petition portion of the Traverse Judgment Proceeds, and therefore is acting as representative of the estate, not in the capacity of agent for Paley Rothman.

15

Further, like in *Bogdan*, the Traverse Action was "directly related to the bankruptcy case." *Bogdan*, *supra*, at 513. The issues raised in the Traverse Action were substantially similar to an adversary proceeding brought by the Trustee against the Debtor in this Court. *See* Adv. Proc. No. 05-01011. In the adversary proceeding, the Trustee sought "unpaid compensation due and owing from [MBI to the Debtor] for services rendered by the Debtor during the period from January 1, 2001 through March 28, 2003." Amended Complaint, p. 8, ¶ 40 (Adv. Proc. No. 05-01011). This contention is virtually identical to the claim in the Traverse Action, although it was brought on a different legal basis.[5] It would have been both inefficient and needlessly costly for both Paley Rothman and the Trustee to litigate the same issues in duplicative proceedings. Further, the Trustee contended at the time that any recovery in the Traverse Action for pre-petition services was property of the estate, and therefore he should be a participant in the Traverse Action. Paley Rothman's assignment of the Traverse Action resolved that issue in favor of the Trustee.[6] These factors lead the Court to conclude with little difficulty that a timely challenge to Paley Rothman's assignment to the Trustee of the Traverse Action would have been unsuccessful under the rationale of *Bogdan*.[7]

---

[5] The Debtor does not dispute this, and concedes that the Trustee "attempted to obtain this same 'imputed wage' as an asset of the Bankruptcy Estate when he pursued Count I of his complaint in Adversary Proceeding #05-01011." Docket No. 406 at p. 26.

[6] The Debtor contends that the Traverse Judgment Proceeds are not property of the estate because they are not, under the Superior Court's ruling, imputed wages, but merely the payment of MBI's liability established by D.C. Code §16-579 for its failure to pay wages. That this analysis seems incorrect is not pertinent here. What is pertinent is whether the Trustee's contention, in February 2005 when Paley Rothman assigned its interest in the Traverse Action to the Trustee, that any recovery based on the Debtor's pre-petition services would be property of the estate was supportable and viable. No one could argue it was not. More significantly, even if the Traverse Judgment Proceeds were not per se property of the estate, they became property of the estate by virtue of the Assignment Agreement.

[7] The Debtor contends that the assignment was not unconditional because Paley Rothman retained its claim in the bankruptcy case. Nothing in *Bogdan* supports this view, and indeed the Fourth Circuit expressly stated that the assignors would recover, "if at all, by sharing from the general assets of the estate on a pro rata basis with all other creditors." *Bogdan*, *supra*, at 513. Obviously, the assignors could only share in estate recoveries through their bankruptcy claims, which they did not give up. Similarly, the Debtor contends that the assignment differs from the assignment in *Bogdan* because Paley Rothman did not assign the underlying judgment. But the critical question is:

16

Finally, the Debtor points out that the Trustee did not seek Court approval before he entered into the Assignment Agreement.  It is not altogether clear why the Trustee did not do so, other than his statement that he did not believe it was necessary.  As the Trustee states, it was well known that the Trustee had taken the assignment of the Traverse Action from Paley Rothman. The Debtor, through counsel, candidly admitted in closing argument that "we knew [the Trustee] took the assignment."  The Trustee's failure to obtain Court approval of the Assignment Agreement could, perhaps, provide Paley Rothman with some avenue for relief, or have other consequences, but it does not mean that the Traverse Judgment proceeds are not property of the estate.

### *Acquisition of the MBI Judgment is Prudent and Reasonable and in the Best Interests of the Estate*.

The Purchase Motion is governed by several provisions of the Bankruptcy Code.  Section 363(b) provides that a trustee "may use, sell, or lease other than in the ordinary course of business, property of the estate . . . ."  This section authorizes a trustee, with certain exceptions not relevant in this case, to use estate assets outside the ordinary course of business.

Such actions by a trustee most often arise in the context of the sale of estate property. The standards governing such action have been described as follows:

> In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated variously ways, represent essentially a business judgment test.  Some courts have described the standard as one of "good faith" or of whether the transaction is "fair and equitable."  Others question whether the sale is "in the best interest of the estate."  In the context of sales of substantially all of the assets of the estate, some courts have required that the price to be paid be "fair and reasonable."  Although a trustee normally would be expected to sell to the highest bidder at an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.  For example, the payment terms may be more favorable, or the trustee may have

---

What did Paley Rothman transfer *with respect to the Traverse Action?*  For the reasons stated in the text, the Assignment Agreement sufficiently transferred Paley Rothman's interest in the Traverse Action to fall within the ambit of *Bogdan*.

substantial reason to doubt the ability of the higher bidder to raise the cash necessary to complete the purchase.

3 Collier on Bankruptcy ¶ 363.02[1][f] (15th rev. ed. 2005).

The Purchase Motion also implicates §345(a).  That section provides:

A trustee in a case under this title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment.

11 U.S.C. §345(a).  Section 345(b) provides that the trustee shall require a bond or deposit securities on investments or deposits "unless the court for cause orders otherwise."

For the reasons that follow, the Court finds and concludes that the proposed acquisition of the MBI Judgment is in the best interests of the estate, and the Trustee has established cause to proceed with it, for three reasons.

First, the United States Trustee supports the Purchase Motion.  *See* Docket No. 444.  The United States Trustee's duties require it to "establish, maintain and *supervise*" the panel of Chapter 7 trustees.  11 U.S.C. §586(a)(1) (emphasis added).  The United States Trustee also is required to "supervise the administration" of Chapter 7 cases, *id.* at §586(a)(3), and supervise deposits or investment of funds received by trustees.  *Id.*; *see also* §586(a)(4).  Given that the duty to review and supervise the Trustee's use of estate funds is at the core of the United States Trustee's functions, the Court gives substantial weight to the United States Trustee's support for the Purchase Motion.

Second, no creditor objects to the Purchase Motion and all creditors who have filed a response to the Purchase Motion support it.  The unsecured creditors who have filed statements

in support of the Purchase Motion represent 78% of the $1.4 million of unsecured claims.[8]  The

creditors who have not filed a response to the Purchase Motion hold relatively small claims in an

amount no greater than $31,000.

      More significantly, one hundred percent of the administrative claimants in the case

support the Purchase Motion.  As stated above, the funds that the Trustee proposes to use for the

acquisition of the MBI Judgment would otherwise be paid to satisfy the administrative claims, in

full or in part depending on the amount of those claims as ultimately allowed by the Court, but

likely only in part.  Accordingly, it is the administrative claimants' funds that will be placed at

risk by the acquisition.  Because administrative claimants do not receive notice of proposed use

of estate funds under §363, the Court initially denied the Purchase Motion without prejudice

pending response or comment from the administrative claimants. As stated above, the Trustee

has now filed statements in support of the Purchase Motion by, according to the Trustee, all of

the administrative claimants in the case.  Each claimant "fully supports" the proposed acquisition

of the MBI Judgment.  *See* Docket No. 451-2, pp.1-5; Docket No. 451-3, p.1.

      While the administration of a Chapter 7 case is not an absolute democracy, the fact that

no creditor objects to the Purchase Motion, and that 78% of the unsecured creditors and 100% of

the parties whose funds will be used in the proposed acquisition affirmatively support it, affirms

the conclusion that the acquisition is prudent and reasonable.  It also assures the Trustee, and the

Court, that the parties whose funds are being used in the transaction are apprised of the risk of

the transaction and accept it as being reasonable.

      Third, based on the Trustee's testimony and evidence, the Court finds and concludes that

the Trustee's acquisition of the MBI Judgment is a prudent and reasonable use of estate funds.

---

[8] Statements in support of the Purchase Motion have been filed by Paley Rothman, Alan Mark and the Estate of Howard Flax.  *See* Docket Nos. 438 and 440. Trustee's Ex. 16 sets forth the name and amount of the unsecured creditors' claims.

The Trustee proposes to acquire for $320,000 the MBI Judgment, which as stated earlier is in the face amount of $1.7 million. The Debtor holds two primary assets that the Trustee would pursue under the MBI Judgment.  One is the Debtor's residence in Potomac, Maryland, against which the MBI Judgment is now a lien.  The Trustee has several estimates of value of the residence, and calculated that the first (and only) lien ahead of the MBI Judgment was approximately $400,000.  These estimates established that there is substantial equity in the residence.  More significantly, the Debtor admitted in an e-mail and in filings in litigation in the Montgomery County Circuit Court that the equity in the residence is at least $640,000 (Trustee's Ex. 8; "house has double the equity Schlossberg offered") or $700,000 (Trustee's Ex. 9, ¶41).

The second primary asset that the Trustee would pursue is a judgment that the Debtor obtained against his father in the Circuit Court for Montgomery County in the amount of $1,374,486.85.  *See* Debtor's Ex. 1.  That judgment is on appeal and therefore presents some risk of recovery.  However, the judgment debtors have posted an irrevocable letter of credit in the amount of $871,570.21.  Thus, if the judgment is affirmed on appeal, the collectability of $871,570.21 at least is not in doubt.  In addition to these two primary assets, the Trustee identified a number of other potential assets that he may be able to recover on the MBI Judgment.

Based on the testimony and exhibits offered by the Trustee, the Court is satisfied that the acquisition of the MBI Judgment is in the best interests of the estate.  The Court need not make any further findings or conclusions on this point.  The Debtor originally contended that the acquisition of the MBI Judgment was not in the estate's best interests.  In closing argument, however, the Debtor's counsel conceded that "I'm not going to . . . suggest to the Court that approval of this deal would not be a benefit to the creditors.  I acknowledge the fact that there is

20

equity in the Fischer family home." Accordingly, there is now no dispute by anyone that the acquisition of the MBI Judgment is in the best interests of the estate.

Finally, the Court notes that the *Bogdan* decision is pertinent to this issue as well. First, there is no question that the proposed assignment is absolute and unconditional. *See* Trustee's Ex. 1 (the Trustee would acquire MBI's "entire right, title and interest in and to the subject judgment."). *See Bogdan*, 414 F.3d at 512.

Second, there is a direct relationship between the Trustee's acquisition of the MBI Judgment and his administration of this case. *See Bogdan* at 513. The Trustee previously challenged the Debtor's tenancy by the entirety exemptions at length and, as he testified, is "too well familiar" with those assets, including the Debtor's residence. The MBI Judgment is joint and several against the Debtor and his nondebtor spouse. Upon acquiring the MBI Judgment, the Trustee will pursue the assets with which he is familiar but which he was previously prevented from administering.

The Debtor contends that allowing the Trustee to acquire the MBI Judgment will result in trustees improperly using estate assets to randomly acquire judgments. But as stated above, the Fourth Circuit determined that a per se ban on Chapter 7 trustees taking assignments from creditors is unsupported by law. Indeed, this same argument was made to the Fourth Circuit in *Bogdan*:

> [A]llowing bankruptcy trustees to sue based on assignments would dramatically and improperly expand the jurisdiction of the bankruptcy courts. They warn that such a rule would prompt trustees to seek out and purchase unrelated causes of action and pursue them in adversary proceedings in hope of increasing the assets of the estate.

*Bogdan*, 414 F.3d at 513. In response, the Fourth Circuit stated:

> This concern is unwarranted specifically in this case and generally in the broader bankruptcy practice context. As for this case specifically, the

21

alleged coconspirators concede that no estate assets were paid to acquire the assignments from the mortgage lenders. Moreover, the trustee and the alleged coconspirators agree that this adversary proceeding is directly related to the bankruptcy case. The collapse of the "flipping scheme" caused, at least in part, Bogdan's bankruptcy.

More generally, our holding in this case is unlikely to lead trustees to hunt down and purchase assignments of causes of action unrelated to the bankruptcy case. The Bankruptcy Code gives bankruptcy courts broad discretion to monitor all aspects of bankruptcy cases and to prevent abuses of process. *See, e.g.*, 11 U.S.C. § 105(a) (providing that bankruptcy courts may, sua sponte, take action to prevent an abuse of process); id. § 330 (granting bankruptcy courts authority to approve or reject, based on a wide-range of factors, compensation applications by trustees for expenses incurred and services rendered). Moreover, our cases establish that trustees must always act in the best interest of the estate. *See*, *e.g.*, *Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 752 (4th Cir.1993) (stating that "[e]quity tolerates in bankruptcy trustees no interest adverse to the trust") (quoting *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951)). These checks and balances will help ensure that trustees forego actions not in the best interests of the bankruptcy estate.

*Id*. at 513-514. The Court reads the foregoing passage as a directive to Bankruptcy Courts to scrutinize carefully actions such as the proposed acquisition by the Trustee here. In part because of this directive, and because the request by the Trustee was unusual, the Court initially denied the Purchase Motion without prejudice pending the support of the Unites States Trustee, the assent of the administrative claimants and an evidentiary presentation establishing that the acquisition was prudent and reasonable. Those events have occurred. Accordingly, the result of the "checks and balances" within the Bankruptcy Code now lead to the conclusion that the proposed acquisition is in the best interests of the estate and should be approved.

## CONCLUSION

For the foregoing reasons the Court will enter an order granting the Motion to Reconsider and the Purchase Motion.

**Copies To:**

Richard E. Schimel, Esq.
Budow & Noble, P.C.
Suite 500, Air Rights Bldg.
7315 Wisconsin Ave.
Bethesda, MD 20814
*Attorneys for the Debtor*

Benson J. Fischer
10503 Democracy Lane
Potomac, MD 20854
*Debtor*

Roger Schlossberg, Esq.
Schlossberg & Associates
134 West Washington Street
Hagerstown, MD 21741
*Chapter 7 trustee*

Frank J. Mastro, Esq.
Semmes, Bowen & Semmes, P.C.
25 South Charles St., Suite 1400
Baltimore, Maryland 21201
*Attorneys for Chapter 7 Trustee*

Leander Barnhill, Esq.
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770
*Office of the United States Trustee*

Roger C. Simmons, Esq.
Gordon & Simmons, LLC
603-B West Patrick Street
P.O. Box 430
Frederick, MD 21705
*Attorneys for Sheldon & Ann Fischer*

Alan S. Mark, Esq.
Paley, Rothman, Goldstein, Rosenberg, Eig & Cooper, Chtd.
4800 Hampden Lane, 7th Floor
Bethesda, MD 20814
*Attorneys for Paley Rothman*

Ursula A. Koenig, Esq.
Rees Broome, P.C.
8133 Leesburg Pike, Ninth Floor
Vienna, VA 22182
*Attorneys for Montgomery Bakers, Inc.*

Harvey A. Levin, Esq.
Thompson Coburn
1909 K Street, NW, Suite 600
Washington, DC 20006
*Attorneys for the Estate of Howard L. Flax*

American Express Centurion Bank
c/o Becket and Lee, LLP
P.O. Box 3001
Malvern, PA 19355
*Creditor*

ChaseManhattan Bank USA, NA,
successor in interest to Bank One Delaware, NA
c/o Weinstein & Riley, P.S.
2101 4th Ave., Suite 900
Seatttle, WA 98121
*Creditor*

Citibank, N.A.
Citibank/CHOICE
Exception Payment Processing
P.O. Box 6305
The Lakes, NV 88901
*Creditor*

Creative Hairdressers, Inc.
c/o James W. Reynolds, Esq.
9302 Lee Highway, #1100
Fairfax, VA 22031
*Creditor*

Hartford Fire Insurance Co.
c/o Lana M. Glovach
Bond Claims Dept., Hartford Plaza T-4
Hartford, CT 06115
*Creditor*

England Family Trust
231 Derwood Circle
Rockville, MD 20850
*Creditor*

Mr. Gary Posner and Ms. Lauren Brisky
5143 North Stanford Drive
Nashville, TN 37215-4229
*Creditor*

NASA Federal Credit Union
Attn: Collections
500 Prince George's Blvd.
Upper Marlboro, MD 20774
*Creditor*

## End of Memorandum of Decision